UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TERRY MCCOY and
NICHOLAS BOLLEA, as
Personal Representatives of the
ESTATE OF TERRY G. BOLLEA,                    Case No.:

      Plaintiff,

v.

BUBBA THE LOVE SPONGE CLEM,

      Defendant.

_____/

## EMERGENCY MOTION FOR TEMPORARY
## RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Federal Rules of Civil Procedure 65 and Middle District of Florida

Local Rules 6.01 and 6.02, Plaintiffs, Terry McCoy and Nicholas Bollea, as co-

personal representatives of the Estate of Terry G. Bollea (the "Estate"), move this

Court for entry of a temporary restraining order and preliminary injunction against

Defendant, Bubba The Love Sponge Clem ("Clem").[1] The grounds upon which this

motion is based and the reasons it should be granted are as follows:

## EMERGENCY NATURE OF RELIEF SOUGHT

Clem plans to release a documentary entitled "Video Killed the Radio Star: The

untold story of the Hulk Hogan sex tape scandal" (the "Documentary") that infringes

---

[1] Clem's birth name is Todd Alan Clem. On information and belief, he legally changed his name to
"Bubba The Love Sponge" Clem in 1999.

upon the Estate's copyrights, violates the terms of a settlement agreement and will cause immediate irreparable harm to the Estate. Consumers will be able to "prebuy" the Documentary on September 3, 2025, and obtain access to content related to the Documentary. Further, on September 5, 2025, Clem plans to host a VIP invite-only premiere at which the Documentary will be published to as many as 500 people. On September 12, 2025, the Documentary will be available to the public through a variety of online on-demand platforms which will allegedly include, without limitation, Apple TV and Amazon Prime. Once the Documentary is released, the Estate will have no ability to prevent its dissemination in violation of its copyright, or to enforce the terms of a settlement agreement executed by Clem which would be breached by the Documentary's release. The Estate respectfully requests that the Court consider this motion on an expedited basis and enter a ruling prior to September 3, 2025, to maintain the status quo.

## **INTRODUCTION**

Clem is a radio and podcast host and self-professed "shock jock" who hosts the Bubba the Love Sponge Show. Clem was formerly a friend of Terry Bollea, professionally known as "Hulk Hogan" ("Bollea"). In 2007, Clem secretly recorded and created a DVD of Bollea engaged in consensual private conduct in a private room (the "Unauthorized Video"). Years later, the Unauthorized Video was leaked to Gawker Media, and an edited version of the video was published online.

Bollea sued Clem for his role in surreptitiously creating and secretly maintaining a copy of the Unauthorized Video. Shortly thereafter, Clem and Bollea entered into a

settlement agreement (the "Settlement Agreement") resolving Bollea's claims against

Clem. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████ Clem is involved

in the forthcoming Documentary. According to Clem, the Documentary will "walk

people through the sex tape drama" and "gets into the sex tape more so than anybody

has ever covered it . . ." Verified Complaint for Injunctive Relief and Damages (the

"Verified Complaint"), ¶ 49. On August 28, 2025, Clem released a trailer of the

Documentary which includes a video clip from the Unauthorized Video and confirms

that Bollea and the Unauthorized Video will be prominently featured. That trailer was

subsequently published on the www.videokilledtheradiostarmovie.com.

The use of any portion of the Unauthorized Video for the Documentary

constitutes a copyright violation. Moreover, Clem's involvement in the Documentary

is a clear breach of the Settlement Agreement. The Documentary is set to premiere on

September 5, 2025, with prebuys available on September 3, 2025. Unless this Court

intervenes, the Documentary will be released, the Estate's copyright will be infringed

upon, the Estate will be deprived of the benefit of the Settlement Agreement, and the Estate will suffer immediate irreparable harm.

<b><u>FACTUAL BACKGROUND</u></b>[2]

**I.    The Settlement Agreement**

On October 25, 2012, Bollea entered into the Settlement Agreement with Clem to resolve his lawsuit against Clem related to the Unauthorized Video.[3]



---

[2] All facts set forth in this section come from the verified allegations in the Estate's Verified Complaint.

[3] The Settlement Agreement includes a provision pursuant to which the parties agree to maintain the confidentiality of the terms of the Settlement Agreement. Consequently, the Estate has not attached a copy of the Settlement Agreement to this motion and has redacted this motion so the terms of the Settlement Agreement are not publicly disclosed. The Estate is filing a motion for leave to submit an unredacted version of this motion and a copy of the Settlement Agreement under seal.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

## II.    Clem seeks approval from Bollea to participate in a documentary about the Unauthorized Video.

In 2020, Clem was purportedly approached to participate in a documentary regarding his "rise, fall and road to redemption" aimed at restoring Clem's brand.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ Bollea never gave Clem consent to proceed with any documentary, nor did he ever review or approve the documentary or any content.

████████████████████████████████████████████
███████████

On June 18, 2025, Clem ignited a media firestorm by starting rumors on the Bubba the Love Sponge Show that Bollea was on his deathbed. ████████████

████████████████████████████████████████

████████████████████████████████████████

For example, during his June 18, 2025 show, Clem stated, "If you did some sniffing around, you might find him at a hospital near you and it's not good. I got some pretty reliable information last night that there are phone calls being made to various family members about getting to town to come say their goodbyes."  Clem further claimed that he heard "Hogan is in the hospital and I've heard people say that he might not make it" and that "he's not doing well, he's not in good shape."

Clem's comments were immediately picked up by numerous news outlets and broadly circulated online. The national media began speculating about Bollea's health, and Bollea's family and friends received constant inquiries.

██ ░ ██████████████████████████████████

████████████████████████

Undoubtedly pleased with national attention his comments were receiving, Clem sought to exploit the interest he manufactured in Bollea's health. Over the next month, Clem regularly discussed Bollea's health condition on his shows and made sensationalistic claims based on his "sources." Clem routinely posted clips of those discussions to Instagram, Facebook, YouTube, and other sites with captions about Bollea. For example, during his show on June 27, 2025, Clem claimed, among other things, that Bollea was in intensive care with a heart valve issue, that there were discussions about Bollea having a heart transplant, that Bollea was still on a ventilator, and that Bollea was in a medically induced coma.

On his July 1, 2025 show, Clem speculated that Bollea was still in the hospital, that there was no way he would be out any time soon, and that doctors were concerned about brain damage. On his July 7, 2025 show, Clem claimed that Bollea suffered brain damage and that his doctors did not know the extent of the issue. On his July 9, 2025 show, Clem speculated that Bollea has been in the ICU for nearly six weeks. And on his July 18, 2025 show, Clem perpetuated a rumor that Bollea "was being kept alive on a machine" and that a purported surgery "caused permanent damage – to his back, vocal cords, even his esophagus."

The above examples are not exhaustive, but are a representative sample of the many instances between June 18, 2025 and July 23, 2025 in which Clem discussed Bollea's health ███████████████████████████████████████

## V.    Bollea tragically passes away.

On July 24, 2025, Bollea tragically passed away. Upon Bollea's death, his rights under the Settlement Agreement, ██████████████████████, and his copyrights in the Unauthorized Video and any other content containing Bollea transferred by Clem to Bollea ███████████████████████████

## VI.    Clem exploits Bollea's death to garner support and to promote his show and documentary.

The day after Bollea passed away, Clem spoke at length about Bollea's death. However, rather than simply honor his former friend's legacy, Clem discussed the Unauthorized Video, the lawsuits surrounding the Unauthorized Video, Clem's role in the unlawful creation of the Unauthorized Video, and various other topics███████

███████████████████████████. But perhaps more disturbing ███

█████████████████████████████ was that

Clem also used Bollea's death as an opportunity to promote his Documentary about the Unauthorized Video.

At the time Bollea passed away, the Documentary was not ready to be released, much to Clem's chagrin. Clem made it clear that he wished the documentary was already available so he could capitalize on the timing. During his Friday, July 25, 2025 show, Clem stated "I wish [the Documentary] could be ready now. Couldn't be any more hotter of a topic." Clem also lamented about how his Documentary would get much more attention if it was being released at that time: "I wish the documentary would drop right now. God, but it's just such a--from getting insurance to getting clearance—it's just a really painstaking process and we've been told one month. Well, this will still--I mean it won't be near the buzz it is now, but it'll still be topical."

On July 28, 2025, just days after Bollea's death, Clem was promoting his Documentary when he appeared on the Piers Morgan Uncensored show to discuss his relationship with Bollea. During the appearance, Clem was asked whether he had an opportunity to reconcile with Bollea. After responding to the question, Clem then seized the chance to promote his Documentary.

It was apparent that Clem hoped to exploit Bollea's death to promote his Documentary and to draw further attention to himself and his show. But, as Clem recognized, the "buzz" around Bollea's death would likely die down by the time his Documentary was set to release. To address this "problem," Clem began

8

manufacturing sensationalistic storylines surrounding Bollea's death. On his August 1, 2025 show, Clem suggested that the Church of Scientology was involved in some sort of cover-up to protect Bollea's wife who Clem said was a Scientologist. Clem questioned why there was no autopsy of Bollea's body, theorized that the Church of Scientology may have been responsible for deciding there would not be an autopsy, and speculated that there was "more to the story."

During his August 4, 2025 show, Clem questioned why the medical examiner did not complete a report and why an autopsy wasn't done. On August 5, 2025, Bollea's daughter, Brooke, called into Clem's show and further perpetuated the notion that there was something suspicious about Bollea's death.

Brooke's appearance garnered national attention for Clem and his show. Unsurprisingly, Clem promoted his Documentary on his show the following day telling one caller "it will blow your mind." When talking about the potential success of the Documentary, Clem stated:

> as long as it's taken to get out, we've we've actually stumbled upon **some very lucky timing** and it's very relevant. **Brooke Hogan certainly helped things yesterday**. That got a ton. I mean, you know, . . . that story was nationally distributed, which might, you know, get me booked on the some very influential podcaster podcasts, you know, maybe a little easier. . . . **Hogan just dying being very topical**. It coming out in four weeks or less. . . I think it really has a chance to to be big. I really do.

Over the following weeks, Clem continued to speculate about Bollea's death implying that something nefarious had occurred to help keep his storyline alive. Among other theories, Clem suggested that Bollea overdosed on pain medication, that

someone injected something into a dialysis machine that caused Bollea's death, and that others were somehow involved in Bollea's death.

On August 18, 2025, Clem appeared on "The Bubba Army Podcast, Bubba Uncensored" during which he provided a detailed update regarding his Documentary including the release date and the date on which people could pre-buy the Documentary. Clem also discussed his plans to try to promote the Documentary on some of the most popular podcasts in the United States, including those hosted by Joe Rogan, Theo Von, Jake Paul, Tucker Carlson.

In the days after Clem provided this updated on his Documentary, he became even more outrageous in his accusations about Bollea's death. For example, on August 19, 2025, Clem stated that "if you have Scientology ties, this is strictly my opinion, you might have something to do with Hulk Hogan's death." Clem also suggested that management in the Clearwater police department was corrupted by the Church of Scientology and was covering up details regarding Bollea's death. At another point in his show, he claimed "one of you out there killed him and everybody's in on the cover-up." Clem even posted a clip from his show on X with a caption stating that he believed Bollea was murdered:



Clem continued peddling his conspiracy theories while also promoting his Documentary in the days that followed. On August 21, 2025, Clem said that "the DEA and the Feds need to step in." That same day, Clem appeared on two different podcasts where he was promoting his Documentary and discussing the Unauthorized Video.

On August 25, 2025, Clem stated that he thought Bollea's wife, Sky, and son, Nick, had something to with Bollea's death because they had the most to gain. Clem couched his outrageous accusations that Sky and Nick were involved in Bollea's death as "his opinion", although he made his baseless and horrific accusations against the implied background of weeks of alleged "insider sources" unlawfully providing him with private information regarding Bollea's health.

On August 26, 2025, Clem continued to suggest that there was some sort of cover-up related to Bollea's death and said that he would be questioning Bollea's wife, doctors, and therapists as suspects, and he posted the following on X:



After touting various conspiracy theories about Bollea's death for approximately four weeks, the time was near for Clem's Documentary to be released. During his show on August 28, 2025, Clem played a 2 minute and 47 second trailer of the Documentary (the "Trailer"). In the Trailer, there is a video clip from the

Unauthorized Video. Further, the Trailer confirms that Bollea and the Unauthorized Video will be prominent features of the Documentary. ██████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

The Trailer was subsequently published online on the website www.videokilledtheradiostarmovie.com (the "Website"). The Website confirms that the Documentary will be available for "pre sale" on September 3, 2025. During his show on September 2, 2025, Clem promoted the Documentary and the Website, and encouraged his listeners to pre-buy the Documentary. Clem confirmed that the Documentary will be premiering on Friday, September 5, 2025 during a private event, and it will be played in its entirety. Clem claims to have sent out 500 invites to the show, and he expects 350 to 400 people to come to the premiere.

██████████████████████████████████████

██████████████████████████████████████

████████████████████████ Clem has said that he has been working on this documentary for years. At no point, however, has Bollea or the Estate ever consented to the publication or dissemination of the Documentary, the content on which the Documentary appears to be based, or to Clem's participation in a production directly related to the Unauthorized Video.

<u>**MEMORANDUM OF LAW**</u>

I.      **Legal Standard**

This Court has the power to issue a temporary restraining order or preliminary injunction where a movant demonstrates that: "(1) a substantial likelihood of succeeding on the merits; (2) that irreparable harm will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) the entry of the relief would serve the public interest." *Schiavo ex. Rel Schindler v. Schiavo,* 403 F.3d 1223, 1225-26 (11th Cir. 2005). The purpose of a temporary restraining order and a preliminary injunction "is to protect against irreparable injury and preserve the status quo until the district court renders a meaningful decision on the merits." *Schiavo ex rel. Schindler v. Schiavo,* 357 F.Supp.2d 1378, 1383 (M.D. Fla. 2005).

## II.  The Estate has a substantial likelihood of succeeding on one or more of its claims.

"To demonstrate a substantial likelihood of success on the merits, [the movant] must make a showing of likely or probable, but not certain, success at trial, on one or more claims." *Se. Mech. Serv., Inc. v. Brody*, 2008 WL 4613046, at *10 (M.D. Fla. Oct. 15, 2008). Plaintiffs need not establish the likelihood of success on all claims; doing so for one claim is enough. *Seacoast Banking Corp. of Fla. v. Diemer,* 2020 WL 1674309 at n. 1 (M.D. Fla. Jan. 17, 2020). Here, the Estate has a substantial likelihood of success on each of its claims.

### A.   Copyright Infringement

The Copyright Act expressly provides for injunctive relief to prevent or restrain infringement. 17 U.S.C. § 502. The copyright laws do not "condone a practice of

infringe now, pay later." *See Woods v. Universal City Studios, Inc.,* 920 F.Supp. 62, 65 (S.D.N.Y. 1996). Accordingly, courts customarily enter injunctions to prevent widespread publication and continued infringement of copyrighted works. *See, e.g., Elvis Presley Enters., Inc. v. Passport Video,* 349 F.3d 622, 624 (9th Cir. 2003) (affirming preliminary injunction prohibiting distribution of documentary that used video clips of Elvis Presley appearances); *Columbia Pictures Indus., Inc. v. Miramax Films Corp.,* 11 F.Supp.2d 1179, 1190 (C.D. Cal. May 29, 1998) (granting preliminary injunction where promotional materials and trailer for documentary likely infringed on film's promotional materials). To prevail on a claim for copyright infringement, a plaintiff must show (1) ownership of a valid copyright registration and (2) the defendant copied protected elements of the allegedly infringed work. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361 (1991).

Copying may be proven by demonstrating access and substantial similarity. *Leigh v. Warner Bros., Inc.,* 212 F.3d 1210, 1214 (11th Cir. 2000). Substantial similarity, in this sense, "exists where an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Id.* (*quoting Original Appalachian Artworks, Inc. v. Toy Loft*, Inc., 684 F.2d 821, 829 (11th Cir. 1982)). While substantial similarity requires that the infringing work copy more than a *de minimis* fragment of a copyrighted work, it need not be of any particular quantitative significance. *See Peter Letterese And Associates, Inc. v. World Institute of Scientology Enterprises*, 533 F.3d 1287, 1307 (11th Cir. 2008). Rather, "the extent of copying must

be assessed with respect to both the quantitative and the qualitative significance of the amount copied to the copyrighted work as a whole." *Id.* Fragmented literal similarity exists when "the work [copies] only a small part of the copyrighted work but [does] so word-for-word." *Palmer v. Braun*, 287 F.3d 1325, 1330 (11th Cir.2002). This may rise to the level of substantial similarity "[i]f this fragmented copy is important to the copyrighted work, and of sufficient quantity." *Id.*

Here, Defendant unquestionably had access to the Unauthorized Video, as he initially, unlawfully, and secretly recorded it in his home. And the Documentary literally copies excerpts of the Unauthorized Video. An average lay observer would immediately recognize scenes from the Documentary as being appropriated from the Unauthorized Video (assuming the Unauthorized Video had been published, as discussed below).

### 1.    Defendant cannot demonstrate the anticipated fair use defense.

The Copyright Act provides that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . ., scholarship, or research is not an infringement of copyright." 17 U.S.C. § 107. Section 107 provides four non-exclusive factors to consider in determining whether a particular use of a copyrighted work is a fair use: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the market for the copyrighted work. *Id.* The four factors must be considered together, not "treated in isolation." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith,* 598 U.S.

508, 550 (2023) (citation omitted). "[B]ecause fair use is an affirmative defense, its proponent bears the burden of proof in demonstrating that it applies." *Apple Inc. v. Corellium, Inc.*, No. 21-12835, 2023 WL 3295671, at *5 (11th Cir. May 8, 2023) (citing *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1238 (11th Cir. 2014)).

### a.    The purpose and character of the use.

The first factor in the fair use inquiry cuts decisively in Plaintiff's favor. The primary focus of this factor is "whether the new work merely supersede[s] the objects of the original creation or instead adds something new," and is therefore transformative. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (citation omitted). If, for example, the work is used but "transformed" into the creation of "new information, new aesthetics, new insights, and new understandings - this is the very type of activity that the fair use doctrine intends to protect." *Campbell,* 510 U.S. at 579. A "work that conveys factual information does not transform a copyrighted work by using it as a 'clear, visual recording' of the infringing work's subject." *McGucken v. Pub Ocean Ltd.,* 42 F.4th 1149, 1158 (9th Cir. 2022) (reversing district court's finding of fair use where newspaper used photographer's photos of Death Valley lake in article).

While the Documentary may touch upon various aspects of Clem's life, it makes no particular commentary upon the Unauthorized Video. Instead, the Documentary improperly uses the Unauthorized Video as "a clear visual recording" of the Unauthorized Video itself. *See McGucken*, 42 F.4th at 1158. And like the lake photographs in *McGucken*, the Unauthorized Video is clearly the subject of the

16

infringing work. The Documentary is purportedly titled *Video Killed the Radio Star: The untold truth of the Hulk Hogan Sex Tape*. Clem has promoted the Documentary as getting "into the sex tape more so than anybody has ever covered it…" and that it would "walk people through the sex tape drama."

In this situation, the work is merely freeriding on the inherent value of the Unauthorized Video. *See Elvis Presley Enterprises*, 349 F.3d at 629 (using video clips of musical performances for their "intrinsic entertainment value" was not transformative); *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1181 (9th Cir.2012) (finding no transformative use by gossip magazine that published a celebrity's private photos of a secret wedding in an expose about the wedding).

Aside from being non-transformative, the Documentary is commercial in purpose, which weighs against fair use. *Cambridge Univ. Press v. Patton*, 769 F.3d at 1243, n. 10 (citing the Fair Use Checklist). The *Elvis Presley Enterprises* court noted that "the degree to which the new user exploits the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise—affects the weight we afford commercial nature as a factor." *Elvis Presley Enters.*, 349 F.3d at 627. There, like here, the defendant sought to profit directly from the copyrights it used without a license. *Id.* at 628. Clem's ongoing promotion of the Documentary, coupled with the pre-release sales strategy and regular references to podcasts and streaming platforms dictate that Clem's primary purpose in releasing the Documentary is to make money.

**b.    The nature of the copyrighted work.**

In reviewing this factor, courts consider the extent to which the copyrighted work is creative and whether it is unpublished. The Unauthorized Video is unpublished, which is a "key" and "critical" factor weighing against a finding of fair use. *Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 554 (1985). "Under ordinary circumstances, the author's right to control the first public appearance of his undisseminated expression will outweigh a claim of fair use." *Id.* at 555.

Two cases similar to the instant case in which a defendant published previously unpublished and surreptitiously obtained works rejected fair use arguments. In *Harper & Row,* The Nation published an article that included verbatim quotes from President Ford's forthcoming memoir, which had been obtained from an unauthorized source. The Supreme Court found the magazine's "use that so clearly infringes the copyright holder's interests in confidentiality and creative control is difficult to characterize as 'fair.'" *Id.* at 564. The Court was clear: "Congress has not designed, and we see no warrant for judicially imposing, a 'compulsory license' permitting unfettered access to the unpublished copyrighted expression of public figures." *Id.* at 569.

Similarly, in *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1181 (9th Cir.2012), the Ninth Circuit reversed a fair use finding where the defendant published previously unpublished photographs of a clandestine celebrity wedding. The court applied "the Supreme Court's admonition that with respect to unpublished works, this factor 'outweighs' [the defendant's] claim of fair use." *Id.* at 1178.

In this case, Clem's conduct is even worse than the defendants' in *Harper & Row* and *Monge* because he *himself* surreptitiously recorded the Unauthorized Video and, later, contracted to keep it confidential. This factor weighs heavily against fair use.

      **c.**      **The amount and substantiality of the portion used.**

The third factor weighs "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). In looking at the "amount and substantiality," the "court must ask whether the defendant has "helped [himself] overmuch to the copyrighted work in light of the purpose and character of the use." *Katz v. Google Inc.*, 802 F.3d 1178, 1183 (11th Cir. 2015) (quotation omitted). This factor examines the qualitative value in addition to the quantitative amount or the original work used. In other words, fair use is unlikely when "the heart" of an "individual copyrighted picture" is used without justification. *McGucken*, 42 F.4th at 1162. Further, "a taking may not be excused merely because it is insubstantial with respect to the *infringing* work." *Harper & Row*, 471 U.S. at 565.

This factor refers back to the first factor because the extent of permissible copying varies with the purpose and character of the use. *Campbell*, 510 U.S. at 586-87. In this regard, even a small quantity of copying would not be fair use because Clem had no transformative purpose to justify any amount of copying. As such, any amount is more than necessary. *See Monge*, 688 F.3d at 1179.

To be sure, until the Estate receives discovery, it is difficult to tell just how much of the Unauthorized Video is used in the Documentary in proportion to the whole copyrighted work. However, given the complete lack of transformative value and the

Clem's violation of his confidentiality obligations, any amount is qualitatively too much. Further, given the unpublished nature of the Unauthorized Video, publication of any kind will inherently cause immediate irreparable harm which must be enjoined.

### d.    The effect of the use on the value of the work.

This factor encompasses both (1) the extent of the market harm caused by the infringement; and (2) whether unrestricted and widespread use would result in a substantially adverse impact on the potential market for the original and derivative works. *Campbell*, 510 U.S. at 590. However, the intentional lack of a market for the original does not necessarily weigh in favor of fair use. The Eleventh Circuit recognizes that even an author who disavows any intention to publish his work "has the right to change his mind." *See Katz*, 802 F.3d at 1184 (*citing Monge*, 688 F.3d at 1181 (quotation omitted)). Even so, the Estate need only show that widespread use would adversely affect the *potential* market for the copyrighted work. *Harper & Row*, 471 U.S. at 568.

Here, the Estate has a right to keep the Unauthorized Video unpublished and should not be penalized for failure to establish market harm. Should the Estate decide to market or license the Unauthorized Video, a prior widespread use would certainly affect the market for the copyrighted work and Bollea's brand. Reputational and resulting economic harm to the Estate is axiomatic. Accordingly, this factor also weighs against fair use.

### B.    Breach of Contract

"[A] settlement agreement essentially is a contract and is subject to the traditional rules of contract interpretation." *Norfolk S. Corp. v. Chevron USA, Inc.*,

371 F. 3d 1285, 1290 (11th Cir. 2004). Under Florida law, "[t]he elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages." *Beck v. Lazard Freres & Co.*, 175 F.3d 913, 914 (11th Cir. 1999) (alteration added; citing *Abruzzo v. Haller*, 603 So. 2d 1338, 1340 (Fla. 1st DCA 1992)).

It is indisputable that Clem breached the Settlement Agreement, which is a valid binding contract. ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████
        █████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████

In short, it is indisputable that Clem breached and intends on continuing to breach the terms of the Settlement Agreement. Accordingly, the Estate has a likelihood of success on the merits of its breach of contract claim.

### III.    The Estate will suffer irreparable harm in the absence of an injunction.

An "injury is 'irreparable' only if it cannot be undone through monetary remedies." *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991). In this case, it would be impossible to quantify monetary damages for Clem's breaches of the Settlement Agreement and the release of the Documentary.



*See Oracle Real Estate Holdings I LLC v. Adrian Holdings Co. I, LLC*, 582 F. Supp. 2d 616, 625 (S.D.N.Y. 2008) (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd,* 339 F.3d 101, 108 (2d Cir. 2003)) ("where the contract right has 'intrinsic value' that cannot be easily quantified, the bargained-for provisions may provide a basis for injunctive relief."); *The Hurry Family Revocable Tr. V. Frankel,* No. 8:18-cv-2869-CEH-CPT, 2023 WL 23805 at *16 (M.D. Fla. Jan. 3, 2023) ("the harm from disclosure [of confidential information] is likely irreparable because once confidential information is disclosed, it cannot be taken back." (quotations and citations omitted)). <span style="background:black">             </span>

███████████████████████████████████████████████

█████████████████████████

        █████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████ *See Ferrellgas Partners, L.P. v.*

*Barrow*, 143 F. App'x 180, 190 (11th Cir. 2005) ("[g]rounds for irreparable injury

include loss of control of reputation, loss of trade, and loss of goodwill.") (internal

citation omitted). This is so because a remedy at law for "'reputational damage is

ordinarily inadequate, given the potential difficulty of proof of plaintiff's damages and

the impairment of intangible values.'" *Boulan v. Think Props., LLC*, 617 F. App'x 931,

934 (11th Cir. 2015) (internal citation omitted). ████████████████████

███████████████████████████████████████████████

█████████████████████████████████

## IV.    The harm suffered by the Estate in the absence of an injunction substantially outweighs the harm, if any, Clem may suffer if an injunction is issued.

The harm caused by Clem's breach of the Settlement Agreement and copyright

violation far exceeds any alleged harm that may result from any injunctive relief

entered against Clem. ████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████. On the other hand,

there will be no substantial hardship on Clem if an injunction is entered. Clem agreed

to the specific terms of the Settlement Agreement, received consideration, and an injunction would simply obligate him to abide by terms to which he's already agreed.

To the extent precluding or delaying the release of the documentary causes Clem some unknown harm, such harm is a result of Clem's conscious decision to breach his obligations under the Settlement Agreement and violate the Estate's copyright in the Unauthorized Video. ██████████████████████ ████████████████████████████████████████████████████ ██████████████████████ Yet, Clem has elected to proceed anyway. Clem "could suffer no legitimate hardship by being forced to stop that which [he has] no right to do." *Tiramisu Int'l v. Clever Imps.*, 741 F. Supp. 2d 1279, 1288 (S.D. Fla. 2010).

## V.    The public interest favors injunctive relief.

An order precluding the publication and dissemination of the Documentary and requiring Clem to stop his ongoing violations of the Settlement Agreement would serve the public interest. "[T]he public has a cognizable interest in the protection and enforcement of contractual rights." *Pitney Bowes Inc. v. Acevedo,* 2008 WL 2940667 at * 6 (S.D. Fla. 2008); *Charles Schwab & Co., Inc. McMurry,* 2008 WL 5381922 at *4 (M.D. Fla. Dec. 23, 2008) ("The public interest is served in ensuring that valid contractual obligations are enforced"). Likewise, an injunction on a copyright claim serves the "public interest because the public interest lies with protecting the rights of copyright owners." *CBS Broad., Inc. v. EchoStar Comm'ns Corp.,* 265 F.3d 1193, 1198 (11th Cir. 2001). There is no competing public interest that outweighs the interest in enforcing and protecting the Estate's contractual rights and copyrights.

## VI.    No bond should be required.

Despite the security requirements set forth in Rule 65(c), "it is well-established that the amount of security required by the rule is a matter within the discretion of the trial court, and the court may elect to require no security at all." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC,* 425 F.3d 964, 971 (11th Cir. 2005) (cleaned up). Here, it is clear that Clem breached the Settlement Agreement and infringed on the Estate's copyright. Under the circumstances, no bond should be required. *See TracFone Wireless, Inc. v. Washington*, 978 F.Supp.2d 1225, 1235 (M.D. Fla. 2013) (no bond required because of a high probability on succeeding on merits).

## VII.    Rule 65(b)(1)(B) Certification of Counsel

Undersigned counsel has not provided notice of this motion to Clem. Clem has shown a complete disregard for his obligations under the Settlement Agreement and there is concern that Clem may release the Documentary upon notice of this motion before the Court has the opportunity to act.

WHEREFORE, Plaintiffs, Terry McCoy and Nicholas Bollea, as personal representatives of the Estate of Terry Bollea, respectfully requests that the Court (1) grant this motion and enter the attached proposed temporary restraining order[4] against Clem and those in active concert or participation with him until a hearing on the preliminary injunction; and (2) grant such further relief as the Court deems just and proper.

---

[4] In accordance with Local Rule 6.01, a proposed order is attached hereto as **Exhibit A.**

Dated:  September 2, 2025.                    Respectfully submitted,

                                             */s/ Kenneth G. Turkel*
                                             Kenneth G. Turkel - FBN 867233
                                             LEAD COUNSEL
                                             E-mail: kturkel@tcb-law.com
                                             Brad F. Barrios - FBN 35293
                                             E-mail: bbarrios@tcb-law.com
                                             David A. Hayes - FBN  96657
                                             E-mail: dhayes@tcb-law.com
                                             TURKEL CUVA BARRIOS, P.A.
                                             100 N. Tampa Street, Suite 1900
                                             Tampa, FL 33602
                                             Tel: (813) 834-9191
                                             Fax: (813) 443-2193
                                             *Attorneys for Plaintiff*