UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TERRY MCCOY AND
NICHOLAS BOLLEA, as
Personal Representatives
of the ESTATE OF TERRY
G. BOLLEA,

      Case No. 8:25-cv-2334-TPB-AAS

    Plaintiffs,

v.

BUBBA THE LOVE SPONGE
CLEM,

    Defendant.
_____/

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Defendant, Bubba the Love Sponge®[1] Clem ("Defendant" and/or "Clem"), hereby files his response in opposition to Plaintiffs', Terry McCoy and Nicholas Bollea, as Personal Representatives of the Estate of Terry G. Bollea, Emergency Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 2), and in support states as follows:

**I.    PRELIMINARY STATEMENT**

Plaintiffs seek the extraordinary remedy of a temporary restraining order and preliminary injunction to censor Defendant Clem. This request is legally and constitutionally unsustainable.

---

[1] Bubba the Love Sponge is a registered trademark of Bubba Radio Network, Inc.

First, and perhaps most importantly, Plaintiffs lack capacity to pursue this action altogether, as no Estate for Terry G. Bollea has been opened and no personal representative appointed. Without capacity, Plaintiffs and their attorneys lack authority to seek injunctive relief or bring this lawsuit altogether. While Plaintiffs plead that they are co-personal representatives of the Estate, they have not been appointed by a Court and cannot legally pursue this relief. This case should be dismissed outright as a result.

Second, Plaintiffs have targeted the wrong party. The documentary at issue is owned, controlled, produced, and distributed by Woltz Films, LLC ("Woltz Films")—not Clem. Woltz Films is the real party in interest with regard to the ownership and control of the film, yet Plaintiffs deliberately chose not to sue Woltz Films. Instead, they sued Clem, who has no creative control, no ownership interest, no distribution rights, and no exhibition rights over the film[2]. (Clem Dec., ¶¶ 3-4). Clem is the subject of the documentary, provided Bubba Radio Network, Inc.'s ("BRN") intellectual property for the film as part of a content license and has agreed to as part of granting content rights for the film to promote the film including, but not limited to, participating in press junkets and attending the premiere and any photo shoots. (Clem Dec., ¶¶ 5-6). He appears in the documentary as an interviewee and commentator, but Clem does not own or control it. The only conduct alleged against Clem is that he posted a publicly

---

[2] The Declaration of Bubba the Love Sponge® Clem ("Clem Dec.") is attached to this Response in Opposition as Exhibit "A".

2

available trailer to his personal website and made statements about Terry G. Bollea ("Bollea") that are within the confines of the operative settlement agreement.

By obtaining an ex parte Temporary Restraining Order ("TRO") against Clem, Plaintiffs have then used the TRO to make an attempt to extend the injunction to Woltz Films of matters that are within fair use under copyright law and under Federal Rule of Civil Procedure 65(d), which allows injunctions to bind parties and those in "active concert or participation" with an enjoined party. This tactic in seeking to extend the TRO is an improper end-run around the rules of due process. Courts consistently hold that "active concert" requires actual evidence of aiding and abetting, not mere association or similarity of interests, and Plaintiffs have failed to wholly meet that standard.

Here, the identity of the film's production company, Woltz Films, was readily available in the public domain including iTunes and the International Movie Database. Plaintiff knew or should have known that Woltz Films was behind the film as shown by the fact that within minutes of the Court entering the TRO, Plaintiffs sent notice of the TRO to an attorney for Woltz Films, and also served notice on Woltz's registered agent. By purposefully bypassing Woltz Films, a non-party to any Settlement Agreement with Bollea, and instead targeting Clem, Plaintiffs secured sweeping early injunctive relief in the TRO against Clem that is now being used as a basis to assert claims to non-parties contrary to well established fair use law and also subjected Clem to senseless litigation. This tactic is improper and further underscores why the TRO must be dissolved.

Third, Plaintiffs cannot satisfy the factors under Federal Rule of Civil Procedure 65. The Settlement ████████████████████████████████████████████████████████████████████████████. Plaintiffs' copyright claim fails because Clem did not produce, distribute, or control the documentary, and any incidental references to the sex tape from verifiable online sources in the public domain are protected as fair use. Plaintiffs cannot establish irreparable harm because Clem's comments in the documentary film reflect Bollea in a positive or neutral light, and any video content was limited to news clips and content previously disseminated and already in the public domain.

## MEMORANDUM OF LAW

### I. Plaintiffs' lack Capacity to Seek Injunctive Relief on Behalf of the Estate.

Plaintiffs, in conclusory fashion, allege they are co-personal representatives of the Estate of Terry Bollea. However, no probate estate has been opened, and no Letters Testamentary or Letters of Administration have been issued appointing them as such. In the Complaint, Plaintiffs allege Terry McCoy and Nicholas Bollea are co-personal representatives on behalf of the Estate. (Doc. 1, ¶ 3). But Plaintiffs fall short of alleging how they were appointed, fail to provide a probate case number, and fail to allege any facts to support the jurisdictional allegation. Pinellas County, Florida, Clerk of Court Records (where Terry G. Bollea resided), do not show that an estate or probate matter has been initiated, nor do any other

4

surrounding jurisdictions show that a probate matter was opened that could have facilitated the appointment of co-personal representatives.

The capacity doctrine relates to the issue of "a party's personal right to litigate in a federal court." *Glickstein v. Sun Bank/Miami, N.A.*, 922 F.2d 666, 670 (11th Cir. 1991), *abrogated on other grounds by Saxton v. ACF Indus., Inc.*, 254 F.3d 959 (11th Cir. 2001); *citing*, 6A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1542, at 327 (2d ed. 1990). In civil cases brought in federal court, Federal Rule of Civil Procedure 17(b) governs the capacity question. That rule provides:

> The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of the individual's domicile. The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized. In all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held....

Fed.R.Civ.P. 17(b).

"[T]he question of whether Plaintiff can raise [plaintiff's] claim on behalf of the Estate is properly characterized as one of capacity under Rule 17(b)." *Robb v. City of W. Palm Beach, FL*, No. 23-80453-CIV, 2023 WL 11878298, at *2 (S.D. Fla. Sept. 5, 2023); *citing*, *Fisher v. PNC Bank*, 2 F.4th 1352, 1358 (11th Cir. 2021) (*quoting Glickstein*, 922 F.2d at 670 (clarifying that "whether a plaintiff may sue on behalf of an estate 'is not a question of standing,' but 'whether the plaintiff has the capacity to bring the action on behalf of the estate'")).

Rule 17(b) provides that a party's capacity to sue on behalf of an estate is determined "by the law of the state where the court is located." Fed R. Civ. P. 17(b)(3). In Florida, the law is clear: "the only party who has the capacity to sue on behalf of an estate is the duly appointed legal representative of the estate." *Tennyson v. ASCAP*, 477 F. App'x 608, 611 (11th Cir. 2012) (citing *Brake v. Murphy*, 687 S.2d 842, 842 (Fla. Dist. Ct. App. 1996)); *Glickstein*, 922 F.2d at 671 (citing Fla. Stat. § 733.601) ("Florida law provides that the personal representative has the capacity to bring actions on behalf of the estate."). Thus, to maintain this action on behalf of the Estate, Plaintiffs must show they have been appointed the Estate's duly appointed personal representative under Florida law. *Robb*, No. 23-80453-CIV, 2023 WL 11878298, at *3.

Simply put, "an 'Estate' is not an entity that can be a party to litigation. It is the personal representative of the estate, in a representative capacity, that is the proper party." *Spradley v. Spradley*, 213 So. 3d 1042, 1045 (Fla. 2d DCA 2017); *see also*, § 733.608, Fla. Stat. (2025); *Reopelle v. Reopelle*, 587 So.2d 508, 512 (Fla. 5th DCA 1991) (highlighting that only the personal representative of a decedent's estate would have the right to intervene in litigation for the benefit of all the beneficiaries of the decedent's estate).

Nor do the attorneys who filed the Motion for Temporary Restraining Order have authority to file for such relief. Even if authority to bring this cause of action was authorized by Bollea before he passed, which is not alleged, it does not cure the defect. Without authorization from the decedent's representative, an attorney

of a deceased client is without authority to act. *Schmidt v. Merrill Lynch Tr. Co.,* 507-CV-382-OC-10GRJ, 2008 WL 2694891, at *3 (M.D. Fla. June 30, 2008). To represent a deceased individual, an attorney must be appointed by a personal representative, who is approved by the court. *Id; see, Bec Construction Corp. v. Gonzalez,* 383 So.2d 1093 (Fla. 1st DCA 1980) ("The death of a client terminates the relationship between the attorney and client and the attorney's authority to act by virtue thereof is extinguished.")*; see also Schaeffler v. Deych*, 38 So.3d 796, 801 (Fla. 4th DCA 2010) ("The death of a party limits the authority of counsel to proceed in the underlying action."); *Brickell v. McCaskill*, 90 Fla. 441, 106 So. 470, 472 (1925) (recognizing the attorney-client relationship "terminated at [the client's] death"); *In re 73 Engle-Related Cases*, 239 So. 3d 166, 169 (Fla. 1st DCA 2018) (After death, "[pleadings] filed by plaintiffs' counsel in these cases failed to confer jurisdiction on the trial court and were **legal nullities**." (emphasis added).

Plaintiffs' bare assertion of representative capacity is conclusory and unsupported by any probate filings, and conclusory allegations are not entitled to the presumption of truth. *See, Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Accordingly, Plaintiffs lack the capacity to sue on behalf of the Bollea Estate, and Plaintiffs' attorneys lack the authority to seek injunctive relief. The TRO should be immediately dissolved and, frankly, the Complaint should be dismissed immediately.

**II.  Plaintiffs Cannot Demonstrate Likelihood of Success on the Merits.**

Even assuming, *arguendo*, that Plaintiffs had capacity to seek this emergency relief, which they do not, Plaintiffs cannot establish the likelihood of success to secure the requested relief.

**A. Breach of Settlement Agreement**

The ▮ confidential Settlement Agreement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Plaintiffs also accuse Clem of exploiting Bollea's declining health and eventual death on his radio show. Yet Clem's statements were truthful and newsworthy. As Plaintiffs themselves acknowledge, Mr. Bollea was hospitalized

---

[3] An unredacted version of the Settlement Agreement has been filed by Plaintiffs, under seal, with this Court. (Doc. 9).

and passed away in July 2025. Clem's public comments accurately reflected these events, which were matters of legitimate public concern.

The Court noted in its Analysis (Doc. 8, p. 4) it not convinced that at this point that the Estate is threatened with immediate and irreparable harm because Clem has allegedly been violating the terms of the Settlement Agreement by publicly discussing Bollea since at least June 2025. ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

"A settlement agreement must generally 'be interpreted like any other contract. That is, absent any evidence that the parties intended to endow a special meaning in the terms used in the agreement, the unambiguous language is to be given a realistic interpretation based on the plain, everyday meaning conveyed by the words.'" *Gulliver Sch., Inc. v. Snay*, 137 So. 3d 1045, 1047 (Fla. 3d DCA 2014); *citing McIlmoil v. McIlmoil,* 784 So.2d 557, 561 (Fla. 1st DCA 2001). It is axiomatic that the clear and unambiguous words of a contract are the best evidence of the intent of the parties. *See Murry v. Zynyx Mktg. Communications, Inc.,* 774 So.2d 714 (Fla. 3d DCA 2000). Where contracts are clear and unambiguous, they should be construed as written, and the court can give them no other meaning. *See Institutional & Supermarket Equip., Inc. v. C & S Refrigeration, Inc.,* 609 So.2d 66, 68 (Fla. 4th DCA 1992). In construing a contract, the legal effect of its provisions should be determined from the words of

the entire contract. *Khosrow Maleki, P.A. v. M.A. Hajianpour, M.D., P.A.,* 771 So.2d 628, 631 (Fla. 4th DCA 2000); *see Walgreen Co. v. Habitat Dev. Corp.,* 655 So.2d 164, 165 (Fla. 3d DCA 1995) ("When a contract is clear and unambiguous, the court is not at liberty to give the contract 'any meaning beyond that expressed.'" (quoting *Bay Mgmt. Inc. v. Beau Monde, Inc.,* 366 So.2d 788, 791 (Fla. 2d DCA 1978))); *see e.g. Spring Lake NC, LLC v. Figueroa,* 104 So.3d 1211, 1214 (Fla. 2d DCA 2012) ("If a contract provision is clear and unambiguous, a court may not consider extrinsic or parol evidence to change the plain meaning set forth in the contract." (quoting *SCG Harbourwood, LLC v. Hanyan,* 93 So.3d 1197, 1200 (Fla. 2d DCA 2012))).



In summary, Plaintiffs' breach of contract theory cannot succeed because there has been no breach of the clear and unambiguous provision of the Settlement

Agreement because: ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████ Thus, claims under the Settlement Agreement offer Plaintiffs no basis for extraordinary equitable relief.

### B. Copyright Infringement

#### i. Plaintiff's Circumvented Proper Procedure by Suing Clem.

Clem did not finance, produce, distribute, or control the documentary; he appeared as its subject, licensed BRN's intellectual property for content, and performed his contractual obligation to promote the film. (Clem Dec. ¶¶ 3-7). Plaintiffs improperly attempt to hold Clem responsible for a film owned and distributed by Woltz Films, LLC, a non-party, which is the real party in interest with regard to ownership and control of the documentary. A court cannot generally enjoin a non-party to the litigation unless the injunction extends to a non-party in *privity* with the enjoined party or agents of the enjoined party, including entities that participated in the enjoined conduct. *RJ's Int'l Trading, LLC v. Crown Castle S. LLC*, No. 20-25162-CIV, 2021 WL 6135124, at *2 (S.D. Fla. Dec. 14, 2021) (emphasis added). Here, Clem performed his obligations to Woltz Films to promote the film, but has no control over the content, nor has he participated in producing, distributing, or exhibiting any infringing content or content that would run afoul of any restrictions in the Settlement Agreement. Clem was provided with

a link to the trailer from the documentary film, provided a link that he received from the producer, and showed the trailer on his August 28, 2025, radio show. The documentary trailer was publicly available the next day on the film's website, but Clem has no contractual or legal right to alter, remove, or restrict the trailer or the documentary film itself. (Clem Dec., ¶ 7). This tenuously linked affiliation does not establish privity with ownership or distribution rights to the documentary film.

Even if a loose connection could be asserted based on the content license and Clem's promotion efforts, "[p]rivity, alone, is insufficient to enjoin a non-party where the non-party acts independently of the enjoined party." *Id., citing*, *ADT LLC v. NorthStar Alarm Servs., LLC*, 853 F.3d 1348, 1352 (11th Cir. 2017) ("An injunction may not extend to persons who act independently and whose rights have not been adjudged according to law.") "[T]here are clearly constitutional limits on the 'privity' exception[.]" *Richards v. Jefferson Cnty., Ala.*, 517 U.S. 793, 799 (1996). "When privity is invoked as a basis for binding a nonparty to an injunction, it is 'restricted to persons so identified in interest with those named in the decree that it would be reasonable to conclude that their rights and interests have been represented and adjudicated in the original injunction proceeding." *Nat'l Spiritual Assembly of Baha'is of U.S. Under Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of the Baha'is of the U.S.*, 628 F.3d 837, 849 (7th Cir. 2010) (quoting 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2956, at 340–41 (2d ed. 1995)).

Plaintiffs deliberately circumvented proper procedure by suing Clem—a non-owner of the documentary—while being fully aware that Woltz Films is the actual producer, owner, and distributor of the film. Their goal was transparent: to obtain a de facto injunction against Woltz Films without naming it as a defendant, by arguing they can properly sweep Woltz Films within the ambit of Rule 65(d)'s "active concert or participation" language. Within minutes of the TRO issuing, Plaintiffs served notice to Woltz Film's legal counsel, and served notice on its registered agent, confirming their true target.

By using Clem as a proxy to improperly enjoin Woltz Films, Plaintiffs seek to deny due process to the real party in interest and to secure relief against a non-party without notice or an opportunity to be heard as to issues that are within the public domain and fair use. Such conduct falls squarely within the doctrine of unclean hands, which bars equitable relief where the movant's own conduct is improper. *See*, *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814–15 (1945). Plaintiffs' misuse of the judicial process disqualifies them from obtaining extraordinary equitable remedies.

### ii. Fair Use Doctrine Applies.

Even if Plaintiffs could reach Clem, their copyright claim lacks merit under the doctrine of fair use. Section 107 of the Copyright Act sets forth four factors: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used; and (4) the effect of the use upon the potential market. 17 U.S.C. § 107. All four factors favor Defendant here.

The purpose and character of the use of the trailer strongly favors fair use. The documentary is a journalistic and historical work that, in part, comments on and contextualizes a notorious celebrity sex tape scandal. This is a documentary about Clem, not Bollea. Bollea was a party necessary to explain the overall historical narrative of the events, but he is not the subject of the documentary film itself. Documentaries providing criticism or commentary are "entitled to a presumption in favor of fair use…" *Brown v. Netflix, Inc.*, 855 F. App'x 61, 62–63 (2d Cir. 2021). It is transformative in that the documentary uses portions of existing, publicly available, media to tell a broader story about fame, media culture, and the destructive nature of a terrestrial radio rivalry. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (transformative works lie at the heart of fair use). *See, also McGillvary v. Netflix, Inc.*, No. 2:23-CV-01195-JLS-SK, 2024 WL 3588043, at *5 (C.D. Cal. July 30, 2024) (documentary's use of news clips and online footage was fair use).

Additionally, the nature of the copyrighted work also favors fair use. Plaintiffs allege ownership of the "sex tape," which involves factual, not fictional, subject matter. The law affords less protection to factual depictions than to creative works. *See, Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 563 (1985). Here, the documentary does not exploit fictional artistry but reports on a factual scandal. The documentary film used no more than was reasonably necessary to establish the story in light of the subject matter of the documentary, *See, Hofheinz v. AMC Prods. Inc.*, 147 F. Supp. 2d 127, 140 (E.D.N.Y. 2001), and

14

all uses were via short clips of news segments addressing the sex tape to provide context, but fails to harm the market for future sales or licensures of the sex tape in whole or in part.[4] *See, Wade Williams Distribution, Inc. v. Am. Broad. Co., Inc.*, No. 00 CIV. 5002 (LMM), 2005 WL 774275, at \*12 (S.D.N.Y. Apr. 5, 2005) ("ABC's use of plaintiff's films in the July 10, 1997 Good Morning America segment was a 'fair use' because it commented on and criticized the films, using short clips from them in a transformative manner unlikely to harm the future marketability of the films.").

The amount and substantiality of the portion used is minimal. "[F]ragmentary copying is more likely to have a transformative purpose than wholesale copying." *On Davis v. The Gap, Inc.,* 246 F.3d 164, 175 (2d Cir.2001). The trailer and documentary do not exhibit the sex tape itself. Rather it uses news clips from publicly available sources that have been disseminated and already exist in the public domain to illustrate why Clem's radio career had been altered. "Transformative works 'add [] something new' to an existing work, endowing the first with 'new expression, meaning, or message,' rather than 'merely supersed[ing] the objects of the original creation." *SOFA Entm't, Inc. v. Dodger Productions, Inc.,* 709 F.3d 1273, 1278 (9th Cir. 2013). At most, fleeting references are made, and any such references are used for transformative purposes such as commentary and criticism.

---

[4] There is no suggestion Plaintiffs intend to market the sex tape.

Finally, Plaintiffs attempt to show infringement by showcasing a letter drafted to Plaintiffs' counsel five (5) years ago seeking participation in the documentary film. (Doc. 1, Ex. B). However, that correspondence was not seeking a license, but rather was asking to see if Bollea was interested in participating and providing creative content. Bollea declined to participate, but knew or should have known of the documentary and never sent a cease and desist or objected to the content before his death. But, even if Clem did ask for permission, being denied permission to use or pay a license fee for a work does not weigh against a finding of fair use. *Campbell*, 510 U.S. at 569, 585 n.18.

It is important to note courts have long established that when performing a fair use analysis, a content creator can choose to use a work pursuant to fair use rather than license the work from the copyright holder. *See, Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1190–94 (2021) (Google's use of JAVA SE code in Android software was a fair use, even after Google's (failed) attempts at negotiating a licensing agreement with Sun/Oracle); *Fisher v. Dees*, 794 F.2d 432, 437 (9th Cir. 1986) (difficulty of licensing in parody context); *Hofheinz v. AMC Prods., Inc.*, 147 F. Supp. 2d 127, 140 (E.D.N.Y. 2001) ("The very point of fair use is that, in certain circumstance[s], . . . the law will not require an infringer of a copyrighted work to obtain such a license if it advances the overall goal of copyright—to create more works.").

For these reasons, the Court is likely to find fair use of the news clips used in the documentary film, which are transformative in nature, and do not infringe

upon Plaintiffs' copyright. At a minimum, this Court should revise the TRO to allow for a fair use exception as to matters and content that are publicly available and exist in the public domain.

### III. Plaintiffs Cannot Demonstrate Irreparable Harm.

The absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper. *See Snook v. Trust Co. of Georgia Bank of Savannah, N.A.,* 909 F.2d 480, 486 (11th Cir.1990) (affirming denial of preliminary injunction even though plaintiff established likelihood of prevailing because plaintiff failed to meet burden of proving irreparable injury); *City of Jacksonville,* 896 F.2d at 1285 (reversing preliminary injunction based solely on plaintiff's failure to show irreparable injury); *Flowers Indus. v. FTC,* 849 F.2d 551, 552 (11th Cir.1988) (same); *United States v. Lambert,* 695 F.2d 536, 540 (11th Cir.1983) (affirming denial of preliminary injunction and stating that a plaintiff's "success in establishing a likelihood it will prevail on the merits does not obviate the necessity to show irreparable harm").

The asserted irreparable injury "must be neither remote nor speculative, but actual and imminent. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000); *citing*, *City of Jacksonville,* 896 F.2d at 1285 (quoting *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 973 (2d Cir.1989)); *accord, Chacon v. Granata,* 515 F.2d 922, 925 (5th Cir.1975) ("An injunction is appropriate only if the anticipated injury is imminent and irreparable."). Plaintiffs' speculation the documentary will harm Bollea's reputation is insufficient. Speculative or conjectural injury cannot

17

justify injunctive relief. In fact, far from harming Bollea, the documentary depicts him as the victim of a sordid scandal that arose from the hostile atmosphere of a terrestrial radio war—hardly disparagement. The bedrock of Clem's commentary in the film ███████████████████████████████████████████████████████████████████████████████████████████████████

Clem's only relationship to the alleged infraction is providing a link to the trailer of a documentary film, which he has no control over. The short trailer itself is not a violation of his Settlement Agreement. As so far as the documentary film is concerned, Clem has no control over the dissemination and/or distribution or production of the film. Injunctive relief against Bubba is not germane to the overall goal of Plaintiffs, which is to improperly thwart the release of a documentary film, including excerpts of the sex tape that currently exist in the public domain on various mainstream media sites and that are within fair use to reference.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court deny Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction, dissolve the Temporary Restraining Order, and dismiss the Complaint for lack of standing.

WHEREFORE, Defendant, Bubba the Love Sponge Clem respectively requests the Court:

1. Dissolve the Temporary Restraining Order entered in this action.

2. Dismiss the Complaint because Plaintiffs lack the capacity to bring this cause of action or seek injunctive relief or damages on behalf of the Estate.

3. Award Defendant its reasonable attorneys' fees and costs incurred in defending against Plaintiffs' improper request.

4. Set an expedited hearing ahead of the September 12, 2025, documentary film's release date if the Temporary Restraining Order is not dissolved on the papers.

5. In the alternative, if the Court declines to Dissolve the Temporary Restraining Order entirely as requested, to revise such Order to allow for the publication and use of content in the public domain consistent with applicable fair use law.

6. Grant such other and further relief as the Court deems just and proper.

Dated: September 9, 2025

Respectfully submitted,

/s/ *J. Kirby McDonough*
J. Kirby McDonough
Florida Bar No. 79031
SPENCER FANE LLP
201 N. Franklin St., Ste. 2150
Tampa, FL 33602
Phone: 813-424-3501
Fax: 813-405-8904
kmcdonough@spencerfane.com
Secondary: ecoutu@spencerfane.com

Counsel for Defendant,
Bubba the Love Sponge Clem

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was electronically filed with the Clerk of the Court via CM/ECF on this 9th day of September, 2025, and served on all parties of record.

/s/ *J. Kirby McDonough*
Attorney