**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

TERRY MCCOY AND
NICHOLAS BOLLEA, as
Personal Representatives
of the ESTATE OF TERRY
G. BOLLEA,

    Plaintiffs,

v.                                                      Case No. 8:25-cv-2334-TPB-AAS

BUBBA THE LOVE SPONGE
CLEM,

    Defendant.
_____/

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**

This matter is before the Court on Plaintiffs' "Emergency Motion for Temporary Restraining Order and Preliminary Injunction," filed on September 2, 2025. (Docs. 2; 6-2). On September 4, 2025, this Court entered a temporary restraining order pursuant to Fed. R. Civ. P. 65, without notice to opposing parties, as Plaintiffs requested. (Docs. 8; 13). On September 9, 2025, Defendant Bubba the Love Sponge Clem filed a memorandum in opposition to the motion. (Docs. 16; 17-1). On September 11, 2025, Woltz Films LLC filed a motion to intervene along with a proposed answer and memorandum in opposition to Plaintiffs' motion. (Doc. 21). The Court held a hearing on September 17, 2025, on the motion for preliminary injunction and motion to intervene, with counsel for Plaintiffs, Clem, and Woltz

Films participating. (Docs. 27; 29). After reviewing the motions, responses, court file, the record, and argument of counsel, the Court finds as follows:

## Background

As set forth in more detail in the Court's grant of Plaintiffs' motion for a temporary restraining order, Plaintiffs Terry McCoy and Nicholas Bollea allege they are co-personal representatives of the Estate of Terry G. Bollea (the "Estate"), who wrestled professionally as "Hulk Hogan." Plaintiffs filed this suit against Defendant Bubba the Love Sponge Clem, a radio personality and former friend of Bollea. They allege that Clem surreptitiously and without Bollea's permission created a video of Bollea engaged in sex with Clem's wife (the "sex tape"). Previous litigation by Bollea against Clem relating to the sex tape resulted in a settlement agreement that, among other things, restricted Clem's ability to make public comments regarding Bollea, including in particular comments regarding the sex tape.

The current suit alleges that Clem has been making comments in violation of the settlement agreement. Plaintiffs seek to prevent this conduct by Clem and to prohibit distribution of a documentary involving Clem titled "Video Killed the Radio Star: The untold story of the Hulk Hogan sex tape scandal," which Plaintiffs allege contains excerpts of the sex tape. The suit alleges that distribution of the documentary will violate the settlement agreement as well as Plaintiffs' rights under federal copyright and trademark law with respect to the sex tape.

Plaintiffs filed a motion for temporary restraining order and preliminary injunction to prevent Clem from promoting or publishing the documentary and other related content, discussing the sex tape or the circumstances surrounding it, "making any video content relating to Bollea," making disparaging comments about Bollea, and "making any other comments or taking any other actions that violate the terms of the Settlement Agreement."

Based on the representations in Plaintiffs' filings and the urgency created by an anticipated screening of the documentary scheduled for September 5, 2025, the Court on September 4, 2025, granted Plaintiffs' motion and issued a temporary restraining order against publishing any portion of the sex tape. This narrow ruling was based on the copyright arguments adduced by Plaintiffs. The Court otherwise denied temporary relief and deferred ruling on Plaintiffs' motion to the extent it sought a preliminary injunction. The restraining order by its terms would expire on September 18, 2025, unless extended by a further order of the Court.

After entry of the order, Clem filed a response in opposition to the motion. Woltz Films' LLC moved to intervene as a defendant in the case, attaching a proposed answer and response in opposition to Plaintiffs' motion. The Court held a hearing in this matter on September 17, 2025. The hearing was attended by litigation counsel for Plaintiffs, counsel for Clem, and counsel for Woltz Films. Plaintiffs' probate counsel also appeared as a witness. At the hearing, the Court indicated that the temporary restraining order previously entered by the Court was

dissolved and Plaintiffs' motion for temporary injunction was denied. This Order further explains those rulings.

## Legal Standard

To obtain a preliminary injunction, a movant must establish: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005); *see also Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 16 (2020). "A preliminary injunction is an extraordinary and drastic remedy, and [the movant] bears the burden of persuasion to clearly stablish all four of these prerequisites." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (internal quotations omitted).

## Analysis

Based on the limited time for review before the expected premiere of the documentary and the representations by Plaintiffs in their filing, the Court initially found Plaintiffs had met their burden for issuance of a temporary restraining order, limited to the excerpts of the sex tape included in the documentary.[1] Upon further review by the Court and considering additional facts adduced by the parties and

---

[1] As noted, the Court's grant of temporary relief was based on Plaintiffs' copyright claims. The Court rejected Plaintiffs' attempt to base relief on Bollea's settlement agreement with Clem. For the same reasons explained in the Court's ruling on the temporary restraining order, the Court denies preliminary injunctive relief based on the settlement agreement. In addition, it should be noted that Clem is not the owner or distributor of the film, and the settlement agreement is with Clem, not Woltz Films.

intervenor Woltz Films in their filings and at the hearing, the Court concluded that Plaintiffs have not met the burden required to continue the injunction and advised the parties at the hearing that the temporary restraining order was dissolved and Plaintiffs' motion for preliminary injunction was denied. The Court indicated it would issue a written order further explaining its decision. Three chief factors influenced the Court's denial of preliminary injunctive relief.

First, it now appears that, contrary to their representations, when Plaintiffs filed their *verified* complaint and motion and when the Court issued the temporary restraining order, Plaintiffs were not co-personal representatives of the Estate of Terry G. Bollea nor were they authorized to file the lawsuit. Counsel for Plaintiffs explained at the hearing that the *verified* representation in the papers filed by counsel reflected a misunderstanding of the status of the Estate and Plaintiffs' status as personal representatives, and that counsel believed the representation was correct at the time the papers were filed. Counsel also argued that any problem of capacity to pursue relief has been cured by the appointment by the Pinellas County Circuit Court of Plaintiff McCoy as "curator" of the Estate on September 8, *after the entry of this Court's temporary restraining order*, and will be further cured in the near future by the issuance of letters of administration to Plaintiffs as personal representatives.

Mistakes happen. But it appears that the issue of Plaintiffs' lack of capacity was called to Plaintiffs' attention by a letter from Woltz Films' counsel on September 5, 2025. *See* (Doc. 25-1). On September 8, 2025, six days after Plaintiffs'

initial filings in this Court, Plaintiffs' probate counsel filed a petition in the probate division of Pinellas County Circuit Court to have Plaintiff McCoy appointed as curator of the Estate, to cure the lack of capacity that existed at the time suit was filed. *See* (Doc. 25-2). Plaintiffs represent that the curatorship was granted. But as time passed, Plaintiffs totally failed to call any of this to the Court's attention. Plaintiffs thereby allowed a misstatement they filed on September 2, 2025, known by Plaintiffs to be a misstatement by September 5, 2025, to remain in the Court file uncorrected until the September 17, 2025, hearing. The Court learned of the misstatement, not from Plaintiffs, but from Clem's memorandum in opposition.

Nonetheless, the Court will not dismiss the complaint based on this defect and has allowed Plaintiffs to file an amended complaint. Based on Plaintiffs' representations at the hearing, that should be accomplished by the end of this week and by that time Plaintiffs, or at least Plaintiff McCoy, presumably will be appointed as the personal representative. Whatever Plaintiffs' status is or will be, the fact remains that as of the time Plaintiffs filed the lawsuit and obtained a temporary restraining order, they did not have the capacity to pursue relief and therefore had no likelihood of success on the merits. The limited argument offered so far by Plaintiffs has not convinced the Court that the problem has been remedied.

Second, it appears the situation portrayed in Plaintiffs' initial filings did not accurately reflect reality. Plaintiffs' motion suggested that a substantial portion of the allegedly copyrighted sex tape, unlawfully obtained by or retained by Clem, was

about to be used by Clem in "his" documentary, and that the chief purpose of the documentary was to profit from presentation of the material from the sex tape, and thereby effectively to "supersede the objects of the original" rather than adding "something new." (Doc. 6-2 at 16) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)). Plaintiffs argued that the documentary would merely free ride on the inherent value of the sex tape.

It now appears, however, based on representations by Clem and Woltz Films that Plaintiffs have not disputed, that Clem is not the owner, producer, or distributor of the film, that Clem was not the source of the excerpts of the sex tape used in the film, that those excerpts were culled by Woltz Films from news reports regarding the sex tape scandal already available to the public, and that the excerpts amount to 14 clips totaling only 38 seconds out of a 2 ½ hour documentary. Plaintiffs have apparently now viewed the documentary but have not filed it with the Court and, as noted, have not disputed any of Clem's or Woltz Films' assertions on this point.

Under the doctrine of fair use codified at 17 U.S.C. § 107, a defendant's use of copyrighted material for purposes of criticism, comment, news reporting, teaching, scholarship or research is not infringement. For purposes of determining whether a defendant has made fair use of copyrighted materials, the statute provides a non-exclusive set of factors: (1) the purpose and character of the use, including whether the use is for non-profit or educational purposes, and whether the use is "transformative," a concept discussed further below; (2) the nature of the

copyrighted work, including whether the work is creative or merely factual, and whether it has been previously published; (3) the amount and substantiality of the portion of the copyrighted work used in relation to that work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. *See* 17 U.S.C. § 107; *Campbell*, 510 U.S. at 578-79, 586-87, 590. The factors are to be explored, and the results weighed together, in light of the purposes of copyright. *Id.* at 578. The analysis of the fair use issue necessarily proceeds on a case-by-case basis and is not susceptible of bright line rules. *Id.* at 577-78.

The key question for purposes of the first factor – the purpose and character of the defendant's use – is whether the allegedly infringing work "merely 'supersedes the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message . . . ." *Id.* at 579 (quoting *Folsom v. Marsh*, 9 F. Cas. 342, 348 (CCD Mass. 1841)). This factor is described as looking to the extent the new work is "transformative." *Id.*

The sort of limited use it now appears Woltz Films has made of the sex tape material, in light of the title of the film, "Video Killed the Radio Star: The untold story of the Hulk Hogan sex tape scandal," makes it overwhelmingly likely that the documentary's inclusion of the excerpts constitutes a "transformative" use and that it constitutes fair use under 17 U.S.C § 107, rather than any attempt to "free ride" or to replace the original work. *See, e.g., On Davis v. The Gap, Inc.,* 246 F.3d 152, 175 (2d Cir. 2001) ("[F]ragmentary copying is more likely to have a transformative

purpose than wholesale copying."). Plaintiffs have provided the Court no evidence suggesting otherwise.

The other factors considered in assessing a fair use defense do not, in the Court's view, show that the fair use doctrine is likely inapplicable. While the documentary appears to be published in part to seek profit, that fact is not determinative and weighs less heavily in the balance given the transformative nature of the use. As to the allegedly copyrighted work itself, although the work is purportedly unpublished by Bollea or Plaintiffs, it appears that excerpts, including but not limited to the excerpts allegedly used in the documentary, have appeared elsewhere. It has not been shown that there is anything particularly "creative" about the sex tape. It further appears that only an insubstantial portion of the tape – approximately 2 percent of the original – was included in the documentary. Finally, given the fragmentary and transformative nature of the use, the chance that uses of excerpts such those in the documentary, even if widely repeated by others, could affect a potential market for the sex tape itself would appear to be negligible.

Weighing these factors, the Court concludes that Plaintiffs have not met their burden of showing a substantial likelihood of success on the merits because the documentary's use of the sex tape is likely to be a fair use. In that regard, the Court has considered the cases cited by Plaintiffs in arguing against fair use but concludes they do not undermine the Court's conclusion.

For example, in *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149 (9th Cir. 2022), an allegedly infringing article addressed certain landscape features, and the article used the author's copyrighted photographs of those features to illustrate the subject. Here, in contrast, the subject of the sex tape is presumably, sexual conduct by Bollea. But unlike the situation in *McGucken*, there is no evidence the subject of the documentary is Bollea's sexual conduct on the occasion filmed (or otherwise). While the documentary has not been provided to the Court, it appears more likely that its subjects are the creation of the tape, the controversy surrounding the tape, and its impact on the people involved. *See also Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18 (1st Cir. 2000) (holding that the use of copyrighted photographs of Miss Puerto Rico Universe, at least one of which showed her naked or nearly so, in an article about the controversy surrounding the photos, constituted fair use).

Third, the Court's conclusion is supported by Judge Whittemore's analysis of a very similar if not identical issue in *Bollea v. Gawker Media, LLC*, 913 F. Supp. 2d 1325 (M.D. Fla. 2012), a decision which Plaintiffs inexplicably did not cite or discuss in their motion. In that case, Gawker Media posted on its website less than two minutes of excerpts from this exact same 30-minute sex tape. *Id.* at 1327, 1331 & n.6. Bollea sued Gawker for copyright infringement, seeking a preliminary injunction. *Id.* at 1326-27.

Judge Whittemore denied preliminary injunctive relief and ruled that there were questions about the validity of Bollea's copyright *and that Gawker's fair use defense created substantial doubt as to whether Bollea could prevail on the merits.*

*Id.* at 1328 (emphasis added).  Judge Whittemore pointed out that the material posted by Gawker consisted of a short, edited excerpt together with three pages of commentary on the topics of public interest in celebrity sex, public interest in Bollea, and the controversy surrounding the surreptitious creation of the sex tape, which was already the subject of substantial discussion in various media outlets. *Id.* at 1328-29.  Also, there was little likelihood that Gawker's use usurped Bollea's potential market for the sex tape.  The Court noted that "the posting of a relatively poor quality edited excerpt from the Video is unlikely to change the demand for the Video and, if anything, may actually increase it." *Id.* at 1331.  The Court also noted the strong First Amendment protections accorded speech on matters of public importance and embodied in the fair use doctrine. *Id.* at 1329.  Here, these same considerations further support denying preliminary injunctive relief.[2]

---

[2] Neither this specific decision, nor the extensive history of prior litigation relating to the sex tape, has been cited by Plaintiffs, Clem, or Woltz Films in their filings to date.  But more importantly, Plaintiffs' verified complaint and motion for a temporary restraining order referred to the prior suit against Gawker Media only as background for the discussion of the settlement with Clem.  They did not disclose to the Court the prior *failed* attempt to obtain preliminary injunctive relief or cite Judge Whittemore's decision.  As it turns out, courts have rejected multiple similar attempts by Bollea to obtain injunctive relief relating to the sex tape.  Judge Whittemore, prior to the order cited above, had denied another, earlier, motion for preliminary injunction. *See Bollea v. Gawker Media*, No. 8:12-cv-2348-T-27TBM, 2012 WL 5509624 (M.D. Fla. Nov. 14, 2012).  Following the order from Judge Whittemore, Bollea voluntarily dismissed his federal suit and re-filed it in state court in Pinellas County, where he obtained a preliminary injunction from that court.  But that injunction was later *reversed* by the Second District Court of Appeal, which held the injunction constituted an unconstitutional prior restraint on speech. *See Gawker Media, LLC v. Bollea*, 129 So. 3d 1196 (Fla. 2d DCA 2014).  Plaintiffs' failure to disclose this prior litigation when seeking *ex parte* emergency relief from this Court is disappointing to say the least.  Especially since counsel for Plaintiffs here was also co-counsel for Bollea in the prior litigation.

For the foregoing reasons, Plaintiffs' motion for preliminary injunctive relief is denied. Because Plaintiffs have not shown a substantial likelihood of success on the merits, the Court has not expressly addressed other requirements for preliminary injunctive relief. The Court also emphasizes that this ruling is provisional, issued solely for purposes of addressing preliminary injunctive relief, and does not constitute a final ruling on the merits. The record before the Court is very limited. This ruling is without prejudice to Plaintiffs' renewing the motion after filing their amended complaint, if they can do so without violating Fed. R. Civ. P. 11. Plaintiffs are advised, however, that at this point the Court will view any such motion with skepticism.

Accordingly, it is

**ORDERED**, **ADJUDGED**, and **DECREED**:

(1)  Plaintiffs' "Emergency Motion for Temporary Restraining Order and Preliminary Injunction" (Doc. 2) is hereby **DENIED** to the extent that Plaintiffs seek a preliminary injunction.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 22nd day of September, 2025.

TOM BARBER
UNITED STATES DISTRICT JUDGE